Filed 1/31/25  P. v. McDermott CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>ROHAN MCDERMOTT,<br><br>      Defendant and Appellant. | B336664<br><br>(Los Angeles County<br>Super. Ct. No. SA052445) |

APPEAL from an order of the Superior Court of Los Angeles County, Kathryn A. Solorzano, Judge.  Affirmed.

Marc Eric Norton for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

In 2006, a jury convicted Rohan McDermott of first degree murder with true findings on special circumstance allegations. The trial court sentenced him to life without parole. Years later, McDermott petitioned for resentencing under Penal Code section 1172.6,[1] which limited accomplice liability for murder. After an evidentiary hearing under that section, the trial court found that McDermott was a major participant in a felony who acted with reckless indifference to human life and denied the petition. McDermott now appeals from the trial court's order denying his petition, contending there was insufficient evidence to support the trial court's finding he acted with reckless indifference to human life. We disagree and affirm the order.

## BACKGROUND

### I.     Evidence at McDermott's trial

Finding it to be an accurate summary of the evidence at McDermott's underlying trial, we take the background, with some additions in brackets, from this division's opinion affirming as modified McDermott's judgment of conviction on direct appeal, *People v. McDermott* (June 27, 2007, B193585) [nonpub. opn.].[2]

---

[1]     All further undesignated statutory references are to the Penal Code.

Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

[2]     Both parties rely on the statement of facts from the opinion and neither contends that the opinion inaccurately summarizes the evidence. An appellate opinion is part of the record of conviction in section 1172.6 proceedings, and a trial court at an evidentiary hearing may consider the procedural history of the

2

"1.  *Prosecution evidence.*

"On April 28, 2004,[3] Dwane Godoy met with defendant McDermott and Alcliff Daley.  They asked if Godoy knew anyone who could get marijuana for them.  Godoy promised to check around.  He contacted Troy Lewis's uncle Dave, who subsequently called back to say Lewis could get the marijuana.

"On the night of April 29, McDermott, Daley, Godoy, Lewis, Dave, and Lewis's girlfriend Karla DeDunn got together at a house on 36th Street.  McDermott said he wanted to buy 100 pounds of marijuana.  Godoy testified the price for this amount of marijuana was between $28,000 and $35,000.  Lewis had 33 pounds of marijuana in DeDunn's S.U.V.  McDermott inspected it and said 'he could work with the stuff,' but he wanted to buy the entire hundred pounds at one time.  The group agreed to meet the following day.  Godoy testified McDermott had been doing all the negotiating during this first meeting.  Later that night, Lewis called Godoy to say he had acquired the rest of the marijuana and the deal could take place in the morning.

"On the morning of April 30, Godoy returned to the house on 36th Street.  McDermott, Daley, Lewis and DeDunn were already there.  This surprised Godoy, because McDermott and Daley only knew Lewis through him; Godoy feared McDermott and Daley might be trying to cut him out of the deal.  The marijuana was in the back of DeDunn's S.U.V.  McDermott was

---

case as recited in the opinion.  (§ 1172.6, subd. (d)(3); *People v. Lewis* (2021) 11 Cal.5th 952, 972.)

[3]     "All further calendar references are to the year 2004 unless otherwise specified."

3

holding a Converse tennis shoe box.  Lewis said, 'Let's count the cash.'  McDermott opened the Converse box, but then both he and Daley started 'to fidget around,' 'acting ... nervous.'  McDermott took some money out of the box.  The money was wrapped in plastic.  Then McDermott put the money back into the Converse box and said he wanted a scale.  Lewis said, 'We don't play games....  It's a hundred and three [pounds] there.  If you short, we gonna give you that.'  Godoy testified he said, 'This is business.  We could do it right here if the cash is right.'  But McDermott replied, 'Well, I need a scale. I want to weigh out everything.'

"They agreed to go to Daley's apartment in Hawthorne because McDermott said he had an electric scale there.  McDermott and Daley left in McDermott's rental car and took the Converse box with them.  Lewis and Godoy went in Godoy's car, and DeDunn drove the S.U.V.  Lewis told DeDunn to drive around until everything was settled.  At one point, the two cars pulled over.  DeDunn was nowhere in sight.  McDermott indicated he would complete the drug deal right there, that he would give them the money when they put the marijuana in his car.  However, a police car drove past just then.  McDermott panicked and said he had to get out of there.  Lewis jumped into McDermott's car and Godoy drove by himself.

"Godoy called Lewis on his cell phone to ask what was happening.  Godoy thought McDermott was trying to convince Lewis to do the deal without him.  Godoy told them to pull over so he could catch up.  When he did, there were more negotiations and then the four of them again agreed to go to Daley's apartment.  Lewis got back into Godoy's car.  Meanwhile, Lewis

stayed in phone contact with DeDunn, who was still driving the marijuana around in her S.U.V.

"Godoy and Lewis got to Daley's apartment complex first. There was a 7-Eleven nearby and Lewis told DeDunn to wait there until it was time to bring the marijuana. When the others arrived, Godoy and Lewis got into McDermott's car and he drove through the security gate into the parking garage. Godoy thought they were going to complete the transaction right there, but McDermott handed the Converse box to Daley and then drove back out onto the street. Daley, Lewis and Godoy went upstairs to Daley's apartment.

"Inside apartment 200, Daley put the Converse box down on a table. He showed Godoy and Lewis pictures of a house he was building in Jamaica. Meanwhile, McDermott telephoned Daley repeatedly. During these calls, Godoy could hear McDermott asking Daley what they were doing. At one point, Lewis went over to the Converse box and said, 'Let's count the money.' Daley told him not to touch it because it was McDermott's money and he didn't want McDermott 'to come upstairs and say ... something is missing....' Finally, McDermott showed up. He did not look at Godoy and Lewis when he came in; he kept his head down and just walked into the kitchen with the Converse box and sat down.

"Daley went into a back room and suddenly reappeared with a gun. He ordered Godoy and Lewis not to move, and he told McDermott to get the tape and tie them up. [McDermott did not seem scared when Daley told him to get the tape. Lewis pleaded with McDermott and Daley not to kill him and said he had a daughter. Godoy similarly told them that they did not have to go through with 'this.'] Daley said he was going to kill

Godoy and Lewis 'and just leave us in the closet to stink up.' He ordered them onto the floor, where McDermott taped their hands and legs. Godoy got his hands free, but when Daley noticed it he put the gun to Godoy's head and said, 'If you do that again, I'm gonna kill you.' McDermott re-taped Godoy's hands.

"Daley announced he was going after the marijuana. He told McDermott to 'get the other gun' and guard Godoy and Lewis. But when Daley left the apartment, McDermott walked out right behind him. Godoy again managed to free his hands and he got to the front door. But as he pulled it open, McDermott suddenly appeared and said, 'You're not going nowhere.' A struggle ensued, during which a window broke. Godoy got away and started screaming for help.

"With McDermott chasing after him, Godoy ran from the apartment complex and hid underneath a car in a neighboring yard. A man holding a shotgun told Godoy he was trespassing, but Godoy refused to leave. When the man's daughter intervened, Godoy begged her to call the police, saying he and a friend had just been 'jacked in that apartment building over there.' The woman called the police, who arrived 40 minutes later.

"Godoy gave police a false story, saying he and his friend had been walking down the street when they were kidnapped. He didn't tell the truth because he realized he could be prosecuted for drug trafficking. When the police took Godoy back to the apartment complex to look around, he did not tell them about apartment 200 or Lewis being tied up there.

"Anna Fitzgerald lived in apartment 201. On the afternoon of April 30, she heard a single gunshot, followed by breaking glass and then someone saying, 'Hey, get back here.' Fitzgerald

6

looked out and saw that apartment 200's security screen door was open and that the doorknob had smashed backward into the kitchen window.

"On the afternoon of April 30, Edna Martinez, assistant manager at Daley's apartment complex, received several telephone messages about a problem in apartment 200. That night, she went to apartment 200. The security screen door had apparently been slammed into the kitchen window, cracking it. Inside the apartment she found Lewis's dead body.

"Lewis had been shot in the head. His hands were behind his back, bound with tape. The Converse tennis shoe box was on the kitchen counter. Inside the box there were several bundles of cut up newsprint. Each bundle was covered by a little paper money and wrapped in cellophane. A similar bundle was found under the front seat of McDermott's car. The total amount of real money in all the bundles was $1,120.

"That night, Godoy's uncle convinced him to go to the police. At first, Godoy repeated his story about having been kidnapped off the street, but after learning Lewis had been killed he described the marijuana deal and what took place inside apartment 200. Godoy gave police the license number of McDermott's rental car, which was found parked in front of Daley's apartment complex.

"Godoy testified he did not have either the marijuana or a gun in his car that day, nor did he have a gun on him when he went up to apartment 200.

"2. *Defense evidence*.

"McDermott testified he was living in Florida in 2004. In late April, he flew to Los Angeles in order to retain an attorney to represent him in a forfeiture proceeding. In November 2003,

7

officers had taken $14,000 from him when he flew into Long Beach, and he wanted to reclaim that money. He was planning to stay with Daley in Hawthorne. Because Daley did not own a car, McDermott rented one.

"On April 29, Daley gave McDermott a ride to the corner of Slauson and Western Avenue, where Daley met with Godoy and spoke to him about buying marijuana. Godoy seemed to know McDermott, but McDermott couldn't place him until he remembered Godoy's cousin had once introduced them. That night, while McDermott stayed at Daley's apartment, Daley borrowed the rental car; McDermott didn't know where he went.

"On April 30, McDermott drove Daley to 36th Street to meet Godoy again. Godoy showed Daley a small plastic bag of marijuana. There was an S.U.V. there with a female driver and a male passenger who McDermott later learned was Lewis. When Daley got back in the car, he told McDermott he had ordered some marijuana from Godoy. McDermott thought Godoy was going to call them to set up the exchange. McDermott and Daley drove to a restaurant to get take-out food. There was never a discussion about a scale and they did not stop anywhere on the street to discuss the drug transaction.

"When they got to Daley's apartment complex, Lewis and Godoy were waiting for them in front. McDermott drove them into the garage and then went to park his car. He suddenly felt uncomfortable about Godoy and Lewis going up to Daley's apartment because he didn't like their 'vibes.' McDermott made a series of phone calls to the apartment, during which he urged Daley to tell Godoy and Lewis to leave. But Daley kept hanging up on him. Finally, Daley told McDermott to come upstairs and McDermott complied.

8

"When he got inside apartment 200, McDermott went to the kitchen to get something to drink. Then he heard his name called. He walked into the living room and saw Daley pointing a gun at Godoy and Lewis. When Daley ordered McDermott to tie them up, McDermott 'said, "Man, I don't want to get involved in this." And when I said that, I was about to leave. But the expression on [Daley's] face change[d], and I tied them up.' Then, when Daley turned his back, McDermott fled from the apartment. As he was running, he heard a loud noise. McDermott could not find his car key, so he ran 'all the way to Century.' He took a cab to where a friend of his worked.

"Several weeks later, McDermott was apprehended in Florida.

"McDermott denied having any more than $100 on him when he landed at Long Beach in April 2004. He testified that when the $14,000 was taken from him at the Long Beach airport in November 2003, he told the detaining officer he lived in Florida. McDermott specifically denied telling the officer he lived in Los Angeles.

"3. *Rebuttal evidence.*

"Michael Vanagas testified he worked at the Long Beach airport as part of a California Department of Justice task force intercepting shipments of drugs and drug money. On November 24, 2003, he seized $14,000 from McDermott. On that day, Vanagas asked McDermott where he lived and McDermott said Los Angeles.

"Vanagas testified he was working the same assignment on April 21, 2004, when he again came into contact with McDermott. Because he remembered McDermott from before, Vanagas searched him and found he was carrying approximately $2,000.

9

Vanagas did not take possession of this money because the policy was to seize only amounts over $5,000." (*People v. McDermott*, *supra*, B193585.)

II.     Verdict and sentence

Daley and McDermott were tried separately. McDermott's jury convicted him of first degree murder committed during an attempted robbery and kidnapping (§§ 187, subd. (a), 190.2, subd. (a)(17)) and found true a principal gun use allegation (§ 12022, subd. (a)(1)). In April 2006, the trial court sentenced McDermott to life without parole plus one year.

III.    Postconviction petition for resentencing

In 2019, McDermott petitioned for resentencing under section 1172.6. The trial court issued an order to show cause and scheduled an evidentiary hearing.[4] In their briefs submitted for the hearing, the parties agreed that the issue was whether McDermott was a major participant in the felony who acted with reckless indifference to human life under current law, although McDermott's counsel conceded that McDermott was a major participant in the felony.

At the evidentiary hearing, the trial court relied on the transcripts from McDermott's underlying trial. The parties did not offer any new or additional evidence.[5] As to whether McDermott acted with reckless indifference to human life, the

---

[4]     The evidentiary hearing was not held until 2024 due to intervening appellate proceedings.

[5]     In his opening brief on appeal, McDermott asked this court to take judicial notice of two declarations, but he withdrew that request in his reply.

10

trial court found that McDermott planned to rip off the victims and lured them to the apartment to steal the marijuana. The trial court made it clear it was not finding that McDermott was the actual killer or in the room when Lewis was shot, based on the jury finding only a principal-armed allegation true as to McDermott. Even so, the trial court disbelieved McDermott's trial testimony that he did not want to participate in the robbery and only tied up the victims because Daley made him. The trial court found crucial to its analysis that McDermott "immobilized somebody knowing that your accomplice is armed and knowing that a primary witness … has successfully escaped the scene and doing nothing, doing nothing except saving your own skin. That to me is reckless indifference." The trial court accordingly denied McDermott's petition for resentencing.

## DISCUSSION

I.     Senate Bill No. 1437 and standard of review

To the end of ensuring a person's sentence is commensurate with the person's individual criminal culpability, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) limited accomplice liability under the felony-murder rule, eliminated the natural and probable consequences doctrine as it relates to murder, and eliminated convictions for murder based on a theory under which malice is imputed to a person based solely on that person's participation in a crime. (See generally *People v. Reyes* (2023) 14 Cal.5th 981, 986; *People v. Lewis*, *supra*, 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843.) As relevant here, Senate Bill 1437 amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of qualifying felonies is liable for

11

felony murder only if the person (1) was the actual killer, (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor, or (3) was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d).  (*Gentile*, at p. 842.)

Senate Bill 1437 also created a procedure, codified at section 1172.6, for a person convicted of murder under the former law to be resentenced if the person could no longer be convicted of murder under the current law.  (*People v. Lewis, supra*, 11 Cal.5th at p. 959; *People v. Gentile, supra*, 10 Cal.5th at p. 847.) A defendant commences that procedure by filing a petition containing a declaration that, among other things, the defendant could not presently be convicted of murder under the current law. (*People v. Strong* (2022) 13 Cal.5th 698, 708.)

If a petition establishes a prima facie case for relief, the trial court must appoint counsel if requested, issue an order to show cause, and hold an evidentiary hearing at which the parties may offer new or additional evidence and the trial court sits as an independent factfinder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory. (§ 1172.6, subds. (b)(3), (c), & (d)(1); *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)  At a section 1172.6 evidentiary hearing, the trial court must give preclusive effect to a jury's finding. (*People v. Arnold* (2023) 93 Cal.App.5th 376, 386–387 [jury's not true finding on knife use allegation has preclusive effect at § 1172.6 evidentiary hearing].)[6]

---

[6]    At the evidentiary hearing here, the trial court took note of *Arnold*.  It is unclear whether on appeal McDermott is making an

12

On appeal, we review the trial court's findings after a section 1172.6, subdivision (d)(3), evidentiary hearing for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; accord, *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.) Under that standard of review we " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 298.) We presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.) We do not resolve credibility issues or evidentiary conflicts. (*Ibid.*) Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) Before we may set aside a trial court's order, it must be clear that " ' "upon no hypothesis whatever is there sufficient substantial evidence to support [it]." ' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

---

argument that the trial court misunderstood *Arnold* or its duty to act as an independent factfinder to determine beyond a reasonable doubt that McDermott was guilty of murder under a valid theory. To the extent McDermott makes any such argument, we reject it. The trial court properly gave effect to the jury's principal gun use finding and otherwise applied the correct standard of review.

II.    *Banks/Clark* factors

The trial court found McDermott guilty of felony murder as a major participant in a felony who acted with reckless indifference to human life under current law.  This area of law has its genesis in two United States Supreme Court cases: *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137.  *Enmund* held that the death penalty could not constitutionally be imposed on an armed robbery getaway driver who was a minor participant in the crime, was not present when the murder was committed, and had no intent to kill. (*Enmund*, at pp. 798, 801.)

In contrast, *Tison v. Arizona, supra*, 481 U.S. at page 139, did not preclude imposing the death penalty for two defendants, brothers, who had helped their father and his cellmate—both convicted murderers—escape from prison.  The defendants gave them guns, and the group later kidnapped a family of four.  The defendants then stood by while their father debated whether to kill the family and proceeded to shoot the family, including a toddler and a teenager.  (*Id.* at pp. 139–141.)  The court held that the Eighth Amendment does not prohibit imposing the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life."  (*Id.* at p. 152; see also *id.* at pp. 157–158.)

Years later, in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court addressed *Enmund* and *Tison* and substantially clarified the "major participant" and "reckless indifference to human life" requirements.  *Banks*, at page 794, considered "under what circumstances an accomplice who lacks the intent to kill

14

may qualify as a major participant." The court listed various factors that should be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

The court then turned its attention to "reckless indifference to human life" in *Clark*. Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Clark*, *supra*, 63 Cal.4th at p. 616.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) Recklessness has both a subjective and an objective component. (*Ibid.*) Subjectively, the defendant must consciously disregard risks known to him. Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Ibid.*)

*Clark* listed factors to consider when determining whether reckless indifference existed: "Did the defendant use or know that a gun would be used during the felony? How many weapons

15

were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?"  (*In re Scoggins* (2020) 9 Cal.5th 667, 677 [summarizing *Clark* factors].)

In evaluating the sufficiency of evidence to support a trial court's finding that the *Banks*/*Clark* factors are established, no one factor " 'is necessary, nor is any one of them necessarily sufficient.' "  (*Clark*, *supra*, 63 Cal.4th at p. 618.)  Rather, we evaluate the factors under the totality of the circumstances to determine a petitioner's place on the culpability spectrum.  (*In re Scoggins*, *supra*, 9 Cal.5th at p. 675.)

III.  Sufficient evidence supports the finding that McDermott was a major participant in a felony who acted with reckless indifference to human life

McDermott conceded below that he was a major participant in the robbery, so he now focuses on whether there was sufficient evidence he acted with reckless indifference to human life.  Cognizant that the *Banks* and *Clark* factors overlap, we focus our analysis on that prong of the inquiry.  (See generally *Clark*, *supra*, 63 Cal.4th at p. 615 [significant overlap exists between factors establishing two prongs].)

The first *Clark* factor we examine is whether McDermott used a lethal weapon or knew one would be used.  (See generally *Clark*, *supra*, 63 Cal.4th at p. 617.)  The evidence shows that two guns were used or available for use during the attempted

16

robbery.  Although there was no evidence that McDermott supplied the guns, the evidence shows that he knew about them.  That is, McDermott was heavily involved in planning and executing the robbery:  he led the negotiations to buy marijuana, inspected the marijuana, had the Converse box containing fake money, and remained in telephonic contact with Daley until McDermott arrived at Daley's apartment.  Crucially, after Daley retrieved one gun in the apartment, he told McDermott to get the "other" gun.  The totality of this evidence raised a reasonable inference that McDermott knew guns would be used and planned to use one himself.  Moreover, given the risk involved in the plan to steal the marijuana from Godoy and Lewis, it is reasonable to infer that McDermott planned to use force to implement the robbery.  While the mere fact a robbery involved a gun is insufficient by itself to support a finding of reckless indifference to human life, the presence of lethal weapons is nonetheless relevant to the required mens rea and weighs in favor of the trial court's conclusion, even if it is not dispositive.  (See generally *In re Scoggins*, *supra*, 9 Cal.5th at p. 682 [anyone who plans or participates in armed robbery anticipates lethal violence might be used, given that one in 200 armed robberies results in death, even though that alone does not establish reckless indifference to human life].)

Next, McDermott was present during most of the events.  McDermott was heavily involved in planning the robbery and in executing it.  He was in the apartment with the victims, leaving only to pursue the fleeing Godoy.  (See *People v. Mitchell*, *supra*, 81 Cal.App.5th at p. 592 [reckless indifference found where defendant was present at every stage of crime:  "planning, execution, dividing the spoils, and flight"].)  Although the trial

17

court could not find that McDermott was present when Lewis was shot, McDermott's presence during other key events supports the trial court's reckless indifference finding.

Given his presence during key events, McDermott was in a position to restrain the crime and Daley. Yet, there is no evidence that McDermott tried to prevent the murder. Instead, he followed Daley's instructions to tie up Godoy and Lewis. Moreover, McDermott tied them up while Daley issued multiple threats to kill Godoy and Lewis. Daley's intent to kill was therefore clear. Indeed, when Godoy loosened his restraints, Daley put a gun to his head and repeated that he would kill Godoy if Godoy did that again. Despite Daley's renewed threat to kill, McDermott retaped Godoy's hands. Therefore, there is a reasonable inference that McDermott tied up the victims to facilitate their murder. (See, e.g., *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [defendant enabled murder by using gun to keep victims at bay during bank robbery].)

For these reasons, McDermott's argument that he was not in a position to restrain the crime or Daley because he left the apartment is unpersuasive. McDermott is not like defendants who had no opportunity to restrain the actual killer and did not know of the actual killer's intent. (See, e.g., *In re Scoggins*, *supra*, 9 Cal.5th at p. 679 [quickness of shooting suggested defendant lacked control over accomplices' actions]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 989 [defendant lacked meaningful opportunity to intervene when he and shooter were on opposite sides of victim's car, and attempted carjacking was quickly executed]; *In re Moore* (2021) 68 Cal.App.5th 434, 452 [defendant present during robbery but not " 'close enough' " to restrain shooter].) McDermott had multiple opportunities to

restrain the crime.  (See, e.g., *In re McDowell* (2020) 55 Cal.App.5th 999, 1014 [after accomplice fired warning shot, defendant had "brief but critical opportunity" to intervene]; *In re Loza* (2017) 10 Cal.App.5th 38, 54 [shooter said he would count to five and then shoot but defendant did not intervene during countdown].)  When Daley threatened to kill the victims, McDermott could have told Daley they were not going to do that.  When Daley told McDermott to tie up the victims, McDermott could have refused.  And when Godoy fled, McDermott could have let him go and stayed to help Lewis.  He did none of those things.  Instead, he tied up the victims, inferentially to make them easier to kill.  And McDermott was only absent from the room when Lewis was killed because the plan went awry when Godoy escaped and McDermott pursued him, inferentially to bring him back to the apartment.

This same evidence shows that McDermott did not try to minimize the risk of violence but instead heightened it. (Compare *People v. Owens, supra*, 78 Cal.App.5th at p. 1024 [bank robbery posed high risk of violence because it occurred during business hours with 20 people present and robbers were armed], with *Clark, supra*, 63 Cal.4th at pp. 621–622 [plan to rob closed store minimized risk of violence]; *In re Scoggins, supra*, 9 Cal.5th at p. 677 [defendant's plan to beat victim and steal his money did not involve use of weapons].)  Tying up the victims, violently struggling with Godoy, and pursuing the escaping Godoy all escalated the violence.  (See, e.g., *In re Harper* (2022) 76 Cal.App.5th 450, 466 [although defendant had no opportunity to minimize risk of violence during planning stage, he could have minimized risk of violence when "original plan . . . unraveled"].)

19

Next, there is no evidence McDermott knew about any propensity for violence Daley had *before* these events. (See generally *In re Bennett* (2018) 26 Cal.App.5th 1002, 1025 [finding " 'significant' " the lack of evidence that the petitioner knew of his confederates' "violent propensities"].) However, Daley's violent nature became clear *during* the events. (See generally *People v. Nieber* (2022) 82 Cal.App.5th 458, 479 [although Nieber did not know about cohorts' likelihood of killing, he knew they brought a weapon and were using it].) That is, Daley instructed McDermott to restrain the victims. Daley also had a gun and told McDermott to get the other gun. And Daley said multiple times that he was going to kill the victims. At that point, Daley's violent intent was unmistakable.

The next factor we examine is the crime's duration, because there is generally a greater opportunity for violence when victims are restrained for prolonged periods. (*Clark*, *supra*, 63 Cal.4th at p. 620.) This event occurred over several days, beginning with meetings between the parties to negotiate. Then, on the morning of the robbery, the parties met at a house and drove to Daley's apartment where, once McDermott arrived, McDermott restrained the victims with tape while Daley held them at bay with a gun. When Godoy was able to free his hands, Daley held the gun to Godoy's head, said he would kill him if he did that again. McDermott retaped Godoy's hands. When Godoy freed his hands again, he violently struggled with McDermott, but Godoy was able to get away. Although the actual duration of the event in the apartment is unclear, it was long enough for McDermott to tie up two victims, to restrain Godoy a second time, and to engage in a violent struggle with Godoy. This factor therefore also supports the reckless indifference finding.

Finally, the evidence raises a reasonable inference that when McDermott ended his pursuit of Godoy, McDermott did not return to the apartment to help Lewis, whom he knew was restrained and alone with an armed Daley who had said he would kill Lewis and leave his body to rot. This is exactly what happened: Lewis was shot in the head and his bound body was not discovered until later that day. Such callous behavior in leaving a restrained victim to be executed supports the reckless indifference finding. (See, e.g., *In re Parrish* (2020) 58 Cal.App.5th 539, 544 [reckless indifference shown by failure to aid or comfort victim]; *People v. Douglas* (2020) 56 Cal.App.5th 1, 10 [petitioner "displayed no interest in moderating violence or in aiding his bloody and suffering victim" and instead picked his pocket].)

The totality of the factors here supports the trial court's ultimate finding that McDermott was a major participant in the attempted robbery who acted with reckless indifference to human life. In particular, McDermott immobilized Godoy and Lewis while Daley repeatedly threatened to kill them. As the trial court found, this factor established the reckless indifference to human life prong. The trial court therefore did not err by denying McDermott's petition.

## DISPOSITION

The order denying Rohan McDermott's Penal Code section 1172.6 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

HANASONO, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22